UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| MICHAEL LADEAUX, ESTATE PLAINTIFF; AND GREGORY DEMARRIAS SR, PERSONAL REPRESENTATIVE FOR THE ESTATE OF MICHAEL LEDEAUX;<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | 3:20-CV-03007-RAL<br><br><br>OPINION AND ORDER GRANTING MOTION TO DISMISS AND SUMMARY JUDGMENT |

Plaintiffs, Michael LaDeaux's estate and its personal representative Gregory Demarrias, Sr., sued Defendant United States of America under the Federal Tort Claims Act (FTCA). Plaintiffs claim that Rosebud Sioux Tribe (RST) Officer Kelli Wooden Knife (Wooden Knife), while allegedly acting in her scope of employment and driving negligently, struck and killed Michael LaDeaux (LaDeaux)[1] with her patrol vehicle on October 1, 2017. Doc. 1. After discovery closed, Defendant filed a Motion to Dismiss for Lack of Jurisdiction and Motion for Summary Judgment, arguing that because Wooden Knife was not acting within the scope of her employment or carrying out functions authorized under the 638 contract, this Court lacks jurisdiction over the claim due to sovereign immunity. Docs. 27, 28. Defendant further argues that LaDeaux's conduct

---

[1] There is an inconsistent spelling of "LaDeaux" within the caption. Doc. 1. The estate plaintiff is this case spells it as "LaDeaux" while the personal representative of the estate being "LeDeaux." Id. However, this opinion will be using the spelling "LaDeaux."

1

constituted "contributory negligence more than slight" under state law entitling Defendant to summary judgment. Id. Because Wooden Knife was off duty at the time and because LaDeaux's negligence was more than slight in comparison to Wooden Knife's negligence as a matter of law, this Court grants the motion to dismiss and the motion for summary judgment.

### I. Facts

This case involves a tragic accident at 11:28 p.m. on October 1, 2017, north of Rosebud, South Dakota, within the boundaries of the Rosebud Sioux Tribe Indian Reservation. On the evening of October 1, 2017, RST Police Officer Kelli Wooden Knife[2] worked the "swing shift" from 3:00 p.m. until 11:00 p.m. Doc. 44 ¶ 7. Wooden Knife arrived at the police station in Rosebud, South Dakota, at 11:04 p.m. and then spent some time talking with people away from her patrol vehicle's radio. Doc. 29 ¶ 26; Doc. 30-1 at 9–10; Doc. 44 ¶ 8.

At 11:12 p.m.[3] a call for service went out concerning a man walking in the middle of BIA Highway 1 (BIA 1). Doc. 44 ¶ 10. In that call for service, the unknown caller stated that he had "almost damn near ran him over." Doc. 29 ¶ 16; Doc. 30-5 at 8. BIA 1 is a north-south, two-lane highway with a posted speed limit of 55 miles per hour. Doc. 29 ¶¶ 2, 14. Wooden Knife's portable radio had died earlier in her shift, and she was away from the radio in her patrol vehicle, so she did not hear dispatch relay the call for service. Doc. 44 ¶ 10. The parties dispute whether Wooden Knife's portable radio died from her negligently failing to charge it properly or from use during a busy shift. Doc. 43 ¶ 26. Regardless, her portable radio was not working around the time of the accident.

---

[2] Since the time of the accident Officer Wooden Knife has gotten married and now goes by Kelli Young. Doc. 30-1 at 1–2. There is also an inconsistent spelling of her first name, sometimes spelt as "Kelly" and other times as "Kelli," however, her timesheets and domicile form have her name spelt with as "Kelli." Id. at 37–40.
[3] The precise time of the call was 23:11:59 p.m. on October 1, 2017. Doc. 44 ¶ 9.

Wooden Knife clocked out and went off-duty at 11:15 p.m. Id. ¶ 11. However, all RST police officers are subject to call even after clocking out, so that off-duty officers can help in case of an emergency or if the off-duty officer chooses to respond to an incident, in which case their hours can show an adjustment for going back on duty. Doc. 48 ¶ 12. Wooden Knife's time sheet reveals that she was not paid for any time after 11:15 p.m. on October 1, 2017. Doc. 30-1 at 38. The Rosebud Sioux Tribe issues patrol vehicles to officers and allows them to use the patrol vehicle to commute and to respond to emergencies when they are on call. Doc. 29 ¶ 25. Wooden Knife left the police station driving her patrol vehicle. Id. It had rained sometime earlier in the evening and the roads were still wet at the time. Doc. 43 ¶ 10.

Wooden Knife began to drive north on BIA 1 towards the Adult Correctional Facility to deliver a Red Bull to Kaylee Bordeaux.[4] Doc. 44 ¶ 8. The correctional facility is not on Wooden Knife's way home, so stopping at the facility was meant to be a quick detour before heading home, but as a patrol officer Wooden Knife was familiar with BIA 1. Doc. 29 ¶ 27; Doc. 30-1 at 17–18. Meanwhile, two employees of the juvenile correctional facility were separately traveling southbound on BIA 1. Id. ¶¶ 17, 19–21; Doc. 44 ¶¶ 20–22. One of those, Martina Crow Eagle (Crow Eagle), was in the passenger seat when her daughter saw a man walking in the middle of the southbound lane of the highway. Doc. 29 ¶ 17. Crow Eagle said she had to grab onto the steering wheel and swerve the car to avoid having the car hit the man because there was no time to brake. Id. ¶ 18; Doc. 30-3 at 8, 18. Then Crow Eagle's co-worker Harlan Guerue (Guerue), driving southbound on BIA 1 at 65 miles per hour, saw a man in the middle of the road. Doc. 29 ¶ 20–21; Doc. 30-4 at 4–5, 7; Doc. 44 ¶ 20. Guerue testified that he only had a few seconds to

---

[4] The parties dispute whether Bordeaux was Wooden Knife's "friend" or "cousin." Doc. 44 ¶¶ 1, 8. However, such a factual dispute is hardly material and Wooden Knife describes Bordeaux as a "friend." Doc. 30-1 at 10.

3

react to the man. Doc. 29 ¶ 21; Doc. 30-4 at 9. Guerue swerved to avoid the man and slowed before eventually pulling to the side of the road to call for assistance. Doc. 44 ¶ 20; Doc. 30-4 at 8–9.

After traveling about two miles north on BIA 1 from the police station, Wooden Knife noticed a vehicle, later discovered to be the one driven by Guerue, coming towards her in the southbound lane of traffic traveling slowly as it passed her. Doc. 44 ¶ 15. Wooden Knife testified that at the time she was driving about 65 miles per hour; the speed limit on BIA is 55 miles per hour. Doc. 29 ¶ 14. Wooden Knife then noticed Guerue's vehicle engage its brake lights and pull off to the side of the road. Id. ¶ 19; Doc. 44 ¶ 15. Wooden Knife watched the car, wondering why it was pulling over, Doc. 44 ¶ 15, specifically pondering if the car was trying to signal her for help or perhaps was being driven by an elderly person, Doc. 39-1 at 4–5; Doc. 48 at 4. Wooden Knife looked in her side mirror, rear view mirror, and then down at her console to see if she had accidentally activated her vehicle's emergency lights. Doc. 29 ¶ 4; Doc. 44 ¶ 15. This review of her surroundings took approximately three to four seconds. Doc. 44 ¶ 15.

LaDeaux had been the man walking in the middle of the road. Id. ¶ 18. LaDeaux was intoxicated, with later testing revealing a blood alcohol level of 0.143% and marijuana in his system. Doc. 29 ¶ 32; Doc. 33 ¶¶ 9–10. The unknown caller described LaDeaux as "drunk," and Guerue testified LaDeaux was "staggering all over the road." Doc. 29 ¶ 21; Doc. 30-5 at 8. LaDeaux was wearing a dark red sweatshirt. Id. ¶¶ 15–16, 18, 21. Three separate drivers already had swerved to avoid LaDeaux while he was walking on BIA 1 before Wooden Knife's vehicle approached. Doc. 29 ¶¶ 16, 18, 21; Doc. 30-3 at 4; Doc. 30-4 at 4; Doc. 30-5 at 8; Doc. 43 ¶ 4.

When Wooden Knife looked back at the road after looking elsewhere for three to four seconds, a red streak hit her windshield on the driver's side of the car. Doc. 44 ¶¶ 15, 18.

Tragically, the red streak that Wooden Knife observed in front of her vehicle was LaDeaux. Wooden Knife's vehicle struck LaDeaux throwing him 14.77 feet southeast. Doc. 29 ¶ 13. Wooden Knife immediately stopped her vehicle, radioed dispatch on her patrol vehicle's radio that she had hit a person, and requested a medical unit. Id. ¶ 15; Doc. 30-1 at 12. Officer Iron Heart arrived on scene and he and Wooden Knife discovered LaDeaux. Doc. 29 ¶ 6. Wooden Knife began CPR on LaDeaux and Officer Jay Romero continued CPR until an ambulance arrived. Id. ¶ 7. A postmortem examination of LaDeaux showed a basilar skull ring fracture, as well as pelvic and rib fractures caused by the accident, with the ultimate cause of death being blunt force injuries. Id. ¶ 31. The coroner opined that LaDeaux's injuries would have resulted in immediate loss of consciousness, followed shortly by death. Id.

The accident occurred at approximately 11:28 p.m. in a rural area that was dark without streetlights. Id. ¶ 17. An accident reconstruction determined that at the time of impact Wooden Knife's vehicle was traveling between 49 and 62 miles per hour. Id. ¶ 14. The area where the accident occurred had good signage and painted lanes. Id. ¶ 11. The patrol vehicle was damaged, with the push bumper folded back and a hole in the center of the windshield. Id. ¶ 12. The tire marks from Wooden Knife's vehicle were straight and within the proper lane of traffic. Id. ¶ 13. A blood draw taken from Wooden Knife after the accident showed she was not under the influence of drugs or alcohol. Id. ¶¶ 7–8.

## II.     Motion to Dismiss

### A. Standard under Rule 12(h)(3)

The United States asserts lack of federal court subject matter jurisdiction and has moved to dismiss under Rule 12(h)(3) of the Federal Rules of Civil Procedure. Docs. 27–28. Under Rule 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court

must dismiss the action." Fed. R. Civ. P. 12(h)(3). A Rule 12(h)(3) motion to dismiss is analyzed under the same standards as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. See Gates v. Black Hills Health Care Sys., 997 F. Supp. 2d 1024, 1029 (D.S.D. 2014). A Rule 12(h)(3) motion differs from a Rule 12(b)(1) motion only in that it can be brought at any time, by any party or interested individual, or *sua sponte* by the court; a Rule 12(b)(1) motion must be made before any responsive pleading. See Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."); 5B Charles Alan Wright et al., Federal Practice & Procedure § 1350 (3d ed.).

"In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993). In any case, "[t]he burden of proving subject matter jurisdiction falls on the plaintiff." V S Ltd. P'ship v. Dep't of Hous. & Urban Dev., 235 F.3d 1109, 1112 (8th Cir. 2000); see also Barnes v. United States, 448 F.3d 1065, 1066 (8th Cir. 2006) (explaining the sovereign immunity of the United States, but "if the plaintiff shows that the government has unequivocally waived that immunity," the case can be heard). A facial challenge is limited to the allegations in the plaintiffs' complaint, and the court must view the allegations in the light most favorable to the plaintiffs. Stalley v. Cath. Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007). "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." Id.

In contrast, where a factual attack is made on the court's subject matter jurisdiction, because "its very power to hear the case" is at issue, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," without transforming the motion

into one for summary judgment. Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990) (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3rd Cir. 1977)); see also Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 451 (6th Cir. 1988) ("When a challenge is to the actual subject matter jurisdiction of the court, as opposed to the sufficiency of the allegation of subject matter jurisdiction in the complaint which may be cured by an amendment to the pleading, the district court has the power to resolve any factual dispute regarding the existence of subject matter jurisdiction."). In a factual attack on a court's jurisdiction, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of [Rule] 12(b)(6) safeguards." Osborn, 918 F.2d at 729 n.6 (internal citation removed). Here, Defendant United States makes a factual attack of the jurisdictional allegations in the complaint. Doc. 28 at 7.

### B. Scope of Employment Analysis

"The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). Congress can waive the United States' sovereign immunity, and "prescribe the terms and conditions on which [the United States] consents to be sued, and the manner in which the suit shall be conducted." Mader v. United States, 654 F.3d 794, 797 (8th Cir. 2011) (alteration in original) (quoting Beers v. State, 61 U.S. (20 How.) 527, 529 (1857)). In a case against the United States, the waiver of sovereign immunity defines the bounds of a court's jurisdiction. See F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994); United States v. Navajo Nation, 537 U.S. 488, 502 (2003) (explaining that the United States' consent to suit is a "prerequisite for jurisdiction" (quoting United States v. Mitchell, 463 U.S. 206, 212 (1983)).

In 1946, Congress passed the FTCA, which makes the United States "liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976). The FTCA was designed both to avoid the injustice of "having meritorious claims hitherto barred by sovereign immunity," and to avoid the additional burden that Congress had of "investigating and passing upon private bills seeking individual relief." United States v. Muniz, 374 U.S. 150, 154 (1963). As relevant to this case, the FTCA waives sovereign immunity for

> personal injury . . . caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

The United States Department of Interior's Bureau of Indian Affairs entered a "638 Contract" with the Rosebud Sioux Tribe under the Indian Self Determination and Education Assistance Act for the Tribe to provide law enforcement services on its reservation. Section E, Administrative Data, of the Annual Funding Agreement in Section U extends FTCA coverage to the Rosebud Sioux Tribe and its employees by deeming them "to be employees of the Federal government while performing work under this contract." Doc. 34-1 at 75; see also 25 U.S.C. § 5321.

In a "FTCA negligence case, whether the employee was acting within the scope of employment is a threshold jurisdictional issue." Two Eagle v. United States, 57 F.4th 616, 621 (8th Cir. 2023). Such a determination is entirely separate from whether the employee was acting negligently. Id. The issue framed by the motion to dismiss is whether Officer Wooden Knife was acting in the scope of her employment and furthering the purpose of the 638 contract at the time

of the accident. Shirk v. U.S. ex rel. Dep't of Interior, 773 F.3d 999, 1005 (9th Cir. 2014). Such a determination is a two-step approach focusing on whether the alleged activity is furthered in the relevant federal contract and whether the actions fall within the scope of employment under state law. Id. at 1006.

Here the two questions are closely related. The purpose of the 638 contract at issue for law enforcement services is to have the Rosebud Sioux Tribe hire and equip police officers and other staff to enforce law and promote public safety on the Rosebud Indian Reservation. Doc. 45 at 8. Wooden Knife was hired as a RST officer under the contract, was in a patrol car, and presumably was still in uniform. However, Wooden Knife was clocked out at the time of the accident and was headed to drop off an energy drink to a friend and then headed home. RST officers are subject to call and Wooden Knife could have gone back on the clock, so to say, if she was called to do so or came across an emergency or other such reason to provide police service. Plaintiffs argue that Wooden Knife was on call 24/7 and point to Wooden Knife's statement that she likely would have turned around to check on Guerue's stopped vehicle if she had not struck LaDeaux to argue that Wooden Knife was furthering the purpose of the 638 contract. Doc. 45 at 7. However, until she actually stopped and turned around to check on Guerue's vehicle and abandoned her aim of dropping off the energy drink and heading home, she was not furthering the purpose of the 638 contract.

The second inquiry is whether under state law the employee was acting within the scope of employment. Under South Dakota law, if an employee is coming or going from work, the employer is not liable because "it is inherently unfair to penalize an employer by imposing unlimited liability . . . for the conduct of its employees over which it has no control and from which it derives no benefit." Tammen v. Tronvold, 965 N.W.2d 161, 169 (S.D. 2021) (cleaned up and

9

citations omitted). Instead, for an employer to be liable for the employee, the acts of the employee must be closely connected to the service for which they are employed. S.D. Pub. Entity Pool for Liab. v. Winger, 566 N.W.2d 125, 128 (S.D. 1997); Aadland v. St. Luke's Midland Reg'l Med. Ctr., 537 N.W.2d 666, 669–70 (S.D. 1995). For an employer to be held liable for the acts of an employee while commuting, two questions must be answered: "(1) whether the employer had control over the employee's commute, and (2) whether the employer derives a benefit from the employee's commute." Tammen, 965 N.W.2d at 169. In this case, Wooden Knife was leaving work in her patrol vehicle provided by her employer. Thus, the employer here had some control over her commute. See id. at 173 (describing that control over the commute can occur if the employee is "being transported to or from work in a mode or means of transportation furnished by the employer as an integral part of the contract of employment.").

Wooden Knife had clocked out and was not truly benefitting her employer in the way one would expect; however, allowing officers to drive their patrol vehicle allows off-duty officers to stop and quickly respond to incidents or investigate suspicious activity that they might run across. A portion of Aadland v. St. Luke's Midland Regional Medical Center, a case focusing on scope of employment for worker's compensation purposes,[5] discusses the scope of employment when an off-duty employee is subject to call.

> The circumstance that the employee is "subject to call" should not be given any independent importance in the narrow field of going to and from work; the important questions are whether the employee was in fact on an errand pursuant to call, and what kind of an errand it was . . . The mere fact that an employee is generally on call should not make a special errand of a normal going and coming trip that is not in response to a special call. A work related inference is required in the jurisdictions which have addressed "on call" situations. [Plaintiff] was not

---

[5] The Supreme Court of South Dakota has "drawn from workers' compensation cases to analyze tort law and found those decisions useful in exploring the themes surrounding scope of employment questions," though does recognize there are significant distinctions between the two bodies of law. Tammen, 965 N.W.2d at 172 (cleaned up).

10

> engaged in the performance of her duties as [an employee] at the time she was injured. While she was on premises owned by her employer, [Plaintiff] was not required to be there at the time as she had not been called back to work and she was not required to remain on the premises when on call. Employer did not compensate [Plaintiff] at her regular wage when she merely wore a pager. . . . We conclude the facts do not warrant a conclusion that [Plaintiff's] injury occurred in the course of her employment.

Aadland, 537 N.W.2d at 670 (cleaned up and citations omitted); see also Tammen, 965 N.W.2d at 171. Further, in the 2021 decision of Tammen v. Tronvold, the Supreme Court of South Dakota found that an on-call volunteer fire fighter was not acting in the scope of employment under the coming and going rule when the volunteer was coming in for a training because the fire department did not benefit more than any other employer would by their employee simply showing up to work. Tammen, 965 N.W.2d at 171. Similarly, Wooden Knife was not benefiting RST law enforcement services by driving to drop off an energy drink to a friend and then going home after completing her swing shift.

Wooden Knife had clocked out and her time sheet reflects that she was not paid for any time thereafter on October 1, 2017. If Wooden Knife actually had stopped and turned her patrol vehicle around to check on Guerue's car, that would be some evidence she returned to being on duty. Wooden Knife's testimony was about a counter factual scenario of what she would have done if she had not hit LaDeaux. Sadly, her vehicle struck LaDeaux as she was still northbound on route to her friend's employment and her home. Because Wooden Knife was not furthering a purpose of the 638 contract and was not acting within the scope of her employment when her vehicle struck LaDeaux, the FTCA does not waive Defendant's sovereign immunity under these facts and the motion to dismiss should be granted. This Court nonetheless will consider the summary judgment motion so as to rule on both motions in case Plaintiffs wish to appeal.

11

### III. Motion for Summary Judgment

#### A. Standard under Rule 56

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); McManemy v. Tierney, 970 F.3d 1034, 1037 (8th Cir. 2020). Rule 56(a) places the burden on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in her pleading but "must set forth specific facts showing that there is a genuine issue for trial." Gacek, 666 F.3d at 1145–46 (citing Anderson, 477 U.S. at 256); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Taylor v. Riojas, 141 S. Ct. 52, 53 n.1 (2020) (per curiam); Intel Corp. Inv. Pol'y Comm. v. Sulyma, 140 S. Ct. 768, 779 (2020).

### B. Contributory Negligence Analysis

Where an act under the FTCA occurs on a reservation, the "law of the place" is the state within which the land is located—in this case, South Dakota. LaFramboise, 439 F.3d at 796; see also Molzof, 502 U.S. at 305 ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law."). The question framed by the motion for summary judgment is whether, under South Dakota law, LaDeaux was contributorily negligence greater than slight in comparison to Wooden Knife's negligence, such that Plaintiffs' recovery on a negligence theory is foreclosed as a matter of law.

South Dakota law on comparative negligence is unique in barring recovery when a claiming party is contributorily negligent greater than slight but rejecting any application of percentages of fault in that determination. SDCL § 20-9-2; see generally Harrison Ford Hagg, Slightly-Gross: South Dakota's Addiction to a Bad Comparative Negligence Law and the Need for Change, 59 S.D. L. Rev. 139 (2014) (discussing South Dakota's approach to comparative negligence as compared to other jurisdictions). Under South Dakota law, a plaintiff can only recover if his negligence was "slight" in comparison with the negligence of the defendant. Lovell v. Oahe Elec. Co-op., 382 N.W.2d 396, 399 (S.D. 1986). Notably, "the comparison is made in respect to defendant's negligence, rather than with the ordinary prudent person." Larmon v. United States, 200 F. Supp. 3d 896, 906 (D.S.D. 2016) (citation omitted). "When facts show that the plaintiff, beyond reasonable dispute, was guilty of negligence more than slight, it is the function of the trial court to hold, as a matter of law, for the defendant." Lovell, 382 N.W.2d at 399; see also Starnes v. Stoggerahn, 160 N.W.2d 421, 426 (S.D. 1968).

The facts viewed in the light most favorable to Plaintiffs support concluding that Wooden Knife was negligent by speeding near the time of the accident and thereby violation SDCL 32-24-

13

8. Wooden Knife believed the speed limit to be 65 miles per hour on BIA 1 and had been traveling at that speed. The posted speed limit actually is 55 miles per hour. Both parties agree that the roadway had sufficient signage. Taking the upper end of the reconstruction of speed, Wooden Knife's vehicle could have been traveling at 62 miles per hour when it struck LaDeaux. The roads were also wet at the time of the accident, though it was not actively raining, arguably meriting travel at an even slower speed.

The facts viewed in favor of the Plaintiffs indicate that Wooden Knife was negligent in not keeping a proper lookout for what was ahead of her and thus arguably violating SDCL 32-24-1. Wooden Knife was looking at her mirrors and console instead of at the road in the seconds just before the impact. Even though Guerue and Crow Eagle only had a few seconds to avoid LaDeaux, they were able to do so. Wooden Knife by contrast said she looked away for three to four seconds, trying to ascertain why Guerue's vehicle was slowing to stop. Plaintiffs calculate that she could have traveled as much as 381 feet in four seconds at 65 miles per hour. Doc. 46 at 2. Finally, Wooden Knife's portable radio had died, whether from her own negligence or from overuse during a busy shift. If Wooden Knife had a properly charged portable radio, perhaps she would have heard dispatch mention a man walking on BIA 1 who was nearly escaping being struck by traffic.

Having stated Wooden Knife's negligence in the light most favorable to Plaintiffs, this Court must determine if LaDeaux's negligence was more than slight by comparison. In assessing the plaintiff's negligence, the trial court can consider three factors: "[1] the precautions plaintiff took for [his] own safety; [2] the extent to which [he] should have comprehended the risk as a result of warnings, experience, or other factors, and [3] the foreseeability of injury as a consequence of [his] conduct." Larmon, 200 F. Supp. 3d at 906 (cleaned up and citation omitted); Associated Eng'rs, Inc. v. Job, 370 F.2d 633, 641 (8th Cir. 1966).

14

LaDeaux was intoxicated with a blood alcohol content of almost twice the legal limit and had marijuana in his system. LaDeaux was walking in the driving lanes of a highway, in the dark, late at night. LaDeaux was not on the shoulder of the road, in the ditch, or even near the side of the road when viewed by the other motorists or when struck by Wooden Knife's vehicle. South Dakota places a duty on pedestrians where there is no sidewalk along a highway to "walk only on the left side of the roadway or its shoulder facing traffic which may approach from the opposite direction." SDCL § 32-27-5. Motorists described that LaDeaux was on the highway, observed by Guerue as "staggering all over the road" and by another caller as "drunk."

Despite nearly being hit by three vehicles, there is no evidence that LaDeaux took any precautions for his own safety. Despite his inebriated state, his blood alcohol content was not so high that he could not comprehend the risks he faced. He was able to ambulate, though he was described by Guerue as "staggering all over the road." LaDeaux should have foreseen the consequences of his conduct generally and specifically after having experienced at least three vehicles pass close to him. Though it is unclear where on the highway LaDeaux was when the first near miss occurred at 11:12 p.m., he should have realized the danger he was in and the need to be on the side of or off the road. But LaDeaux was in the driving lanes of the highway some 14 to 16 minutes later, almost being struck by two different motorists before finally being hit by Wooden Knife's vehicle. Crow Eagle described him as being in the center of the southbound lane, and Guerue described him as being in the middle of the highway, requiring their vehicles to swerve to miss him. LaDeaux would have walked into the northbound lane but still toward the center of the highway to be hit by the driver's side of Wooden Knife's vehicle, which was traveling entirely within the northbound lane. Doc. 29 ¶ 13.

LaDeaux's negligence was more than slight in comparison to Wooden Knife's negligence. A pedestrian, even an inebriated one, can foresee that walking in the driving lanes of a highway at night poses a risk of being hit by traffic. This is particularly true for LaDeaux who was nearly hit 16 minutes earlier and remained near the middle of the road, almost to be hit two additional times, before finally being struck and killed. LaDeaux could reasonably expect that more vehicles were traveling on BIA 1 that evening. By contrast, a motorist like Wooden Knife, even one going ten miles over the speed limit whose attention is distracted by another vehicle slowing toward a stop, cannot reasonably expect that a person is walking on a highway at night in their driving lane.

More recent cases from the Supreme Court of South Dakota tend to leave for the finder of fact whether contributory negligence of a plaintiff was greater than slight. But there are instances where the Supreme Court of South Dakota has determined as a matter of law that contributory negligence greater than slight existed, and those cases all involved negligence by a plaintiff of a less obvious nature than LaDeaux's conduct. See, e.g., Jackson v. Van Buskirk, 424 N.W.2d 148 (S.D. 1988) (finding contributory negligence more than slight as a matter of law where plaintiff chose to use of top half of aluminum extension ladder lacking rubber safety pads to prevent slippage when plaintiff and defendant had equal knowledge of the risk); Lovell, 382 N.W.2d 396 (reversing jury verdict and finding contributory negligence greater than slight barring recovery by person electrocuted when pulling a pipe and rod from a well beneath power lines despite argument and jury verdict that defendant was negligent for placing power lines above as well); Myers v. Lennox Co-op., Ass'n, 307 N.W.2d 863 (S.D. 1981) (finding that plaintiff voluntarily accepted the risk of injury as a matter of law by stepping on pile of discarded lumber causing him to fall and have an arm caught in rotating hopper of a garbage truck). The most parallel South Dakota case is Nugent v. Quam where the Court reversed a judgment for a plaintiff pedestrian because the

plaintiff pedestrian was contributorily negligent greater than slight in comparison with defendant motorist; the plaintiff pedestrian crossed a busy street at dusk outside the crosswalk and did not keep a look out for traffic, as compared to the defendant motorist whose negligence appears to have surrounded his speed, control, and look out. 152 N.W.2d 371 (S.D. 1967). Although Nugent is dated authority and although there several cases where the Supreme Court of South Dakota deferred contributory negligence to the jury, LaDeaux's negligence was of such a nature that, as a matter of law, it was more than slight in comparison to that of Wooden Knife.

### IV. Conclusion

For the reasons described above, it is hereby

ORDERED that the United State's Motion to Dismiss for Lack of Jurisdiction and Motion for Summary Judgment, Doc. 27, is granted.

DATED this 31st day of March, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE